Ruth A. GRINDSTAFF

v.

BURGER KING, INC.

Civ. No. 3–80–72.

United States District Court,
E. D. Tennessee, N. D.

June 3, 1980.

David A. Burkhalter, Pamela L. Reeves, Knoxville, Tenn., for plaintiff.

Robert L. Crossley, Knoxville, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This is a sex discrimination case. Plaintiff claims that while an employee of the defendant she was discriminated against

because she was a woman. Defendant denies the charge. The Court recently heard proof in the case, at which a number of witnesses testified.

Plaintiff became employed by the defendant in Detroit, Michigan in 1974. In 1975, she became a Restaurant Manager (RM) in one of defendant's stores in Detroit. She subsequently moved to Tennessee in May, 1975, but prior to leaving Detroit she requested a cut-back to Assistant Manager II [1] (AMII) because she had been informed that there were no openings for RM's in Knoxville. She went to work for the defendant in Tennessee, and in November, 1975, became AMI. She remained in that position until January, 1979, when she was terminated. From 1975 to 1979, numerous vacancies occurred in the Knoxville District for RM. She sought the position and made known her ambition from time to time to her DM.[2] At least nine males were promoted around plaintiff to fill those positions, several of whom had been trained under the supervision and guidance of plaintiff.

After a number of restaurant positions had been filled by men, plaintiff began to ask questions why she had not been promoted. She claims that a DM, Tony Whitfield, told her that she was considered unpromotable because the company was looking for "young, white, single males." This was vigorously denied by Whitfield. Plaintiff claims that after she started to object to the discrimination, defendant's employees began to look for ways to find fault with her work. This, too, is denied by the defendant and its employees. On January 29, 1979, plaintiff was terminated as an employee of the defendant. Plaintiff claims that defendant's failure to promote her and her subsequent termination were unlawful employment practices prohibited under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a).

The parties apparently agree on the applicable principles of law that control the case. The burden of proof is upon the plaintiff to establish a prima facie case of unlawful discrimination. See *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court stated in that case that the plaintiff must carry the initial burden by showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; (iv) that, after his rejection, the position remained open and the employer continued to seek applicants for persons of complainant's qualifications." *Id.* at 802, 93 S.Ct. at 1824.

Plaintiff in the present case has established all of the elements of a prima facie case, with the possible exception of whether she was qualified for the position of RM in Knoxville, Tennessee. She claims that she was and that the proof so shows, while defendant claims that she was not.

Defendant admits that plaintiff got along well with other employees, but says that she performed inadequately in the technical aspects of a manager's position. For example, defendant says there was insufficient staffing on her shifts. In the opinion of the Court, this contention carries little or no weight. The proof shows that such staffing problems were commonplace (Ex. 4) and that she used all of the members of the staff that were available to her. There were complaints that her figuring of shake and fry yields were inadequate. The proof showed that she did as well with the fry yields and shake yields as did the other managers. (Ex. 4). There were claims that closings of the store under her supervision

1. The hierarchy of lower-level management positions with Burger King, from bottom to top, is as follows: Assistant Manager II (AMII), Assistant Manager I (AMI), Restaurant Manager (RM), District Manager (DM). It is the DM who decides whether and when to promote AMII's and AMI's.

2. The evidence shows that between 1975 and 1979, there were two DMs for the Knoxville area: Tony Whitfield from March 1977 to sometime in 1978; and David Doyle, who succeeded Whitfield and stayed until shortly after plaintiff's termination in January, 1979. Kagley, Doyle's successor, apparently also had a hand in the decision to terminate plaintiff.

were not up to company standards. There was proof that she did not sufficiently clean, or cause to be cleaned, the store when it was closed on certain occasions, but she did as good a job in this respect as did the other managers. In short, these same problems were experienced by others who were promoted around her.

Only one month before her termination, and after a meeting between Don Gleason, plaintiff's RM, and David Doyle, her DM, Gleason began to keep a detailed record of all of plaintiff's alleged errors. (Ex. 11). The question was propounded as to why this belated report was made approximately one month before she was terminated, and the reply was that her supervisors felt she was going to cause trouble and they wanted to protect themselves against her charges by documentation. It is interesting that the criticisms contained in this report were not mentioned in the other store manager's report covering the same dates. (Ex. 4). In this connection, the Court points out that although there appears to be complete and detailed evaluations of other managers in personnel files supplied by the defendant, there is only one evaluation of plaintiff's performance and that indicated that she was as qualified as the other managers.[3]

Several other points are of interest. The proof shows that while most management employees remained in the position of Assistant Manager I for an average of 32.62 weeks, the plaintiff remained in this position for 166 weeks, until the termination. Stephen Scruggs was promoted to manager after only eighteen weeks as Assistant Manager I and at the time of his promotion had not been interviewed or evaluated by Doyle. (Ex. 7).

It is also interesting to note the statistical information supplied by defendant in response to plaintiff's interrogatories. In 1978, defendant employed 240 females and 113 males as food handlers. But in AMII positions there were 7 males and 2 females; in AMI positions there were 7 males and 2 females; and there were 8 males and 1 female in RMs. Similarly, in 1979, there were 107 male and 245 female foodhandlers, as opposed to 6 male and 1 female AMIIs, 6 male and 2 female AMIs, and 6 male and 1 female RMs. In 1980, there were 120 males and 261 female foodhandlers, 15 male and 2 female AMIIs; 7 male and 0 or 2 female AMIs[4]; and 8 male and 1 female RMs. While defendant's explanation for this discrepancy was that women were generally less willing to relocate, at least one male applicant, Don Gleason, who was plaintiff's RM and is now a DM, indicated on his application that he was unwilling to relocate. (Ex. 7).

Defendant's main contention is that the reason plaintiff was not made Manager was because she was not qualified. She failed to meet the standards of Manager by failing to correct repetitive mistakes; failed to profit when the mistakes were called to her attention; failed to give due attention to technical details necessary to profitable maintenance of the restaurant. While a number of witnesses testified that she was not competent for an RM position, these were interested witnesses, still employed by the defendant, and their testimony should be weighed accordingly. Steve Carver, whom plaintiff had trained and had become a Restaurant Manager, but who is no longer with Burger King, testified she was qualified. Also, several hourly employees testified that she was competent as an AMI.

The Court is convinced, after deliberate study, that although the higher officers of defendant were careful to avoid

---

**3.** David Doyle, a DM, evaluated plaintiff on October 19, 1978, only three months before she was terminated. Plaintiff was given a "Qualified" rating in all but two categories, for which she received a "Commendable" rating. "Qualified" is defined as "A fully acceptable employee who consistently meets all requirements of position accountabilities." "Commendable" is "above average." Doyle, still employed by Burger King, testified that he gave her a better rating than she deserved for "motivational purposes," but in view of his interest in this litigation, the Court gives this little weight.

**4.** Plaintiff's and defendant's copies of the answers to the interrogatory in question did not agree on this figure, but the discrepancy is not material.

discrimination and made written statements, one of which was posted in each of defendant's restaurants, announcing its commitment to equal opportunity employment (Ex. 14), plaintiff was unfairly treated by some of the management employees of the defendant. Defendant's counsel conceded during argument that defendant would be responsible for the action of its DMs.

■ We come now to the issue of damages. The statute allows the Court to award back pay from a date not more than two years prior to the filing of a charge with the Equal Employment Opportunity Commission, 42 U.S.C. § 2000e–5(g), and up to the time of trial. *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir. 1974). The statute also provides that "interim earnings or amounts earnable with reasonable diligence by the person . . . discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g). The remedy afforded to a prevailing plaintiff is within the discretion of the trial court. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). There being no showing of other specific instances of the discrimination demonstrated in this case, the Court is of the opinion that this is not a proper case for an injunction.

■ Plaintiff filed a claim with the Commission on May 29, 1979 (Ex. 8), and would be entitled to back wages from May 29, 1977. However, the Court is of the opinion that the evidence does not demonstrate that without the discrimination plaintiff would have been promoted to position of Restaurant Manager until early 1978. Further, the proof shows that there were jobs available in the fast food industry at the time of plaintiff's termination which paid approximately $12,500.00 annually—less than defendant, but more than plaintiff earned at Levi-Strauss. The Court finds that this higher salary was "earnable with reasonable diligence" by plaintiff, and therefore must operate to reduce the award of back pay.

Applying these principles to the figures available to the Court, we award the plaintiff $10,708.58 in back wages, arrived at as follows: In 1978, the average salary for a Restaurant Manager in Knoxville was $16,432.00. During that year, the plaintiff earned $13,148.12 (Ex. 5).[5] The difference is $3,283.88. In 1979, the average salary of Restaurant Managers in Knoxville was $17,999.78. While plaintiff earned $9,338.17 from Levi-Strauss, she could have earned as much as $12,500.00 in a more comparable job in the fast food industry for which she was qualified. Thus, her damages for 1979 totaled $5,499.78. Finally, while normally plaintiff is entitled to damages through the date of trial, plaintiff has been on maternity leave from her present job since May 1. Since there is no reason to assume that plaintiff would not have taken the same leave had she remained with defendant, she can only be awarded damages for the first third of 1980. Figuring in an across-the-board 5% cost-of-living pay raise, the average earnings of a Restaurant Manager for the relevant period would be $6,299.92, compared to $4,375.00—which plaintiff could have earned during that period. The difference is $1,924.92. Thus, the total back wages due for 1978, 1979, and 1980 equal $10,708.58.

Finally, under 42 U.S.C. § 2000e–5(k), the prevailing party is entitled, in the discretion of the Court, to reasonable attorney's fees. The Court fixes such fees at $1,000.00, to be taxed as costs against defendant.

Accordingly, it is ORDERED that plaintiff be awarded $10,708.58 in back pay. It is further ORDERED that defendant pay $1,000.00 attorney's fees as part of the costs of this action.

Order Accordingly.

---

**5.** Plaintiff's affidavit states that she also made $650.00 in 1978 selling Avon products. We do not figure this amount into the calculations of her damages.