**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION Norma Lester**

v.

**HIGH TOP COAL COMPANY, INC., Koppers Co., Inc.**

**Civ. No. 3–80–315.**

United States District Court,
E. D. Tennessee, N. D.

Dec. 24, 1980.

Joseph Ray Terry, Jr., Lawrence Kamenetzky, Alayne Barry Adams, Carolyn Howard, E.E.O.C., Memphis, Tenn., Dorothy B. Stulberg, Oak Ridge, Tenn., for Lester.

D. Tate Rich, Nashville, Tenn., Anne Greer and Courtney Pearre, Knoxville, Tenn., for High Top.

Lewis R. Hagood, Knoxville, Tenn., for Koppers Coal.

Jerome Templeton, Knoxville, Tenn., Thomas W. Phillips, Oneida, Tenn., Rudolph Ennis, Knoxville, Tenn., for South East Coals.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This is a sex discrimination case brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* (Title VII). Plaintiff Equal Employment Opportunity Commission (EEOC) claims that defendant High Top Coal Company, Inc. (High Top) discriminated against plaintiff-intervenor Norma Jean Lester, and against women as a class, in its operation of certain strip mine sites located in Campbell County, Tennessee, by refusing to hire them on account of their sex. Koppers Company, Inc. (Koppers) was joined under Fed.R.Civ.P. 19(a) as a successor employer.

### Findings of Fact

The case came on for trial by the Court on December 18, 1980. Based on the evidence presented, the Court makes the following findings of fact:

(1) Until June 2, 1980, High Top owned and operated several strip mine sites and three coal tipples [1] in Campbell County. On or about June 2, High Top sold a good portion of its assets to Koppers Co., including its mine sites in Campbell County, and the equipment required to mine the sites and operate the tipples. Under a separate agreement with Koppers, High Top agreed to continue operating the sites for 90 days after purchase, and it did so until about August 4, 1980. On or about that date, operation of the sites was transferred to South East Coal Company, which operated them as agent of Koppers (Ex. 65) until the mines were closed down on October 3, 1980.

(2) In April or May, 1978, plaintiff Lester learned through her husband, who worked for High Top, that the position of scale

---

1. A coal tipple is akin to a distribution center where the freshly mined coal is weighed, sorted, stockpiled, and eventually loaded on railroad cars for shipment to its destination. Of the three tipples owned by High Top, only Royal Blue Tipple is of concern to us in this case. The Newcomb Tipple is a smaller tipple located in the area.

house operator at the Royal Blue Tipple may be coming open. Lester spoke to the tipple foreman, Jerry Watkins, who told her that as far as he was concerned she could have the job if and when it became available and advised her to turn in an application at the field office in LaFollette. Lester submitted her application in May, 1978. (Ex. 43, 52).

(3) At the time Norma Jean Lester submitted her application, the job of scale house operator at Royal Blue Tipple was not available. It is undisputed that the man operating the scale house remained at that job for from four to six weeks after Ms. Lester spoke to Watkins. That operator was replaced for about two weeks by a man who had been laid off as scale house operator at Newcomb tipple. The job did not actually become available until about August 1, 1978.

(4) Prior to the Spring of 1978, the job of the scale house operator was simply to weigh the incoming coal trucks, fill out the weight slips, and direct the driver where to deposit his load. In the Spring of 1978, the operation of the Royal Blue Tipple was expanded, and the scale house operator was given more responsibility in directing the coal traffic in and out of the tipple. The added responsibilities included preparing bills of lading, pricing the coal and billing the customers. The operator was responsible for the bookkeeping required in shipping some 75,000 to 100,000 tons of coal per day at a price of $29.00 to $30.00 per ton. Further, it was the job of the scale house operator to coordinate by radio the delivery of coal loads at the tipple from the various feeder mine sites.

(5) Jerry Watkins was the foreman of the Royal Blue Tipple in charge of production. His duties were to supervise the blending of the coal grades according to the order being filled, and to see that the rail cars were loaded as quickly and as efficiently as possible. He never hired a scale house operator.

(6) The scale house is physically removed from the tipple production area, and is not a part of the production operation. We find that in May, 1978, Jerry Watkins had no authority to hire a scale house operator. Only Charles Whalen, General Manager of High Top, and Barry Smith, tipple superintendent, had such authority. We further find that Jerry Watkins never informed either Whalen or Smith about his conversation with Norma Lester.

(7) Plaintiff Lester raised a large family and her job experience was limited. She worked as a cashier at a co-op in Detroit for two years, and as a cashier/file clerk/delivery person in a dental lab for five years. Her only supervisory experience, other than raising a family, was a short-lived attempt to operate a family-run restaurant in 1975. (Ex. 43). (The restaurant failed after it was robbed.)

(8) Alvin Carmany was the man who was hired as scale house operator in August, 1978, instead of plaintiff Lester. Prior to working for High Top, he had worked for 22 years as a finishing room manager at a textile mill in LaFollette. (Ex. 31). This entailed supervision of about 100 employees. In early 1977, he moved to South Carolina and worked at a similar job for about four months. Dissatisfied with his new location, he moved back to LaFollette, sold furniture and appliances for nine to ten months and then applied for the scale house position. He received a glowing recommendation from his previous employer. (Ex. 30).

(9) On August 2, 1980, High Top employed a total of 108 employees at its mine and tipple sites. Of these, three were women, all holding clerical positions. (Ex. 45).

From January 1974 through August 2, 1980, High Top hired a total of 276 production workers,[2] of which one was a woman. (Ex. 46).

(10) The evidence shows that between January, 1974 and August 2, 1980, a total of six women arguably applied for production

---

**2.** For the purposes of this statistic, "production workers" includes equipment operators, labor-ers, mechanics, and scale house operators. (Ex. 46).

worker positions, including scale house operator.

(a) Mae Tuscher applied in June, 1977, and was hired as a scale house operator at the Newcomb Tipple. She worked for several months, then took a leave of absence and never resumed working.

(b) Norma Jean Lester, plaintiff-intervenor in this action, spoke to foreman Watkins and submitted her application for scale house operator position in April or May, 1978. At the time she applied, the position was not open, and no outsider was hired to take that job until August, 1978. She applied to a foreman who had no authority to hire her, and there is no evidence that her application was ever brought to the attention of those who did have such authority until after the position was filled by Alvin Carmany.

(c) Sylvia Lamb spoke to the mine foreman at a High Top strip mine on Peabody Mountain in February, 1979 and again on June 7, 1979. There is no evidence that she ever completed an application. Ms. Lamb testified that the man to whom she talked on the second occasion, R. L. Kitts, told her that he wouldn't hire any women unless he had to. Plaintiffs presented no evidence, however, that there were any openings at either of the times she applied.

(d) Valerie Watkins and Sherry White applied together at several mines on Walnut Mountain on August 6 and 16, 1979. We find, however, that Sherry White and Valerie Watkins never actually applied to High Top Coal Company for employment. R. Gene Smith, President of High Top, testified that High Top owned and operated two strip mines in the area in question, neither of which was located on Walnut Mountain. Further, there is no mention in the notebook kept by Ms. Watkins of her ever having applied or talked to anyone at a High Top mine. (Ex. 34).

(e) Wilma Green applied at the field office in LaFollette in June, 1980, after the sale to Koppers. She testified that the office manager there told her there were no openings then, but that the company would be hiring women in the future. She called back an unspecified number of times, but was always told there were no openings. There is no evidence that High Top hired any more employees after Ms. Green applied until it ceased operation of the sites on August 4.

*Conclusions of Law*

(1) Plaintiffs seek recovery under both the "disparate impact" theory, *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and the "disparate treatment theory," *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). *See Grano v. Department of Development*, 637 F.2d 1073 (6th Cir. 1980).

A. Disparate impact theory.

■ (2) We hold that plaintiffs have failed to state a claim under the disparate impact theory. In order to make out a case under *Griggs, supra*, plaintiff must allege and prove that the employer is using some *device or practice* in the hiring of its employees which, though neutral on its face, has the effect of screening out a disproportionate number of women. *See, e. g., Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs, supra*, at 431; *Grano, supra*, slip op. at 1081. There need be no showing of discriminatory intent with respect to the use of such a device. *Griggs, supra*, at 432, 91 S.Ct. at 854; *Teamsters, supra*, 431 U.S. at 335–36 n. 15, 97 S.Ct. at 1854–55 n. 15.

■ Plaintiff's claim that the practice of having the foremen, all of whom are men, hire their own workers on an as-needed basis without requiring them to seek applications from the general community, constitutes a facially neutral device or practice. We disagree. The Court is of the opinion that the practice or device required must be objectively measurable, like an I.Q. test, grade point average or level of education. *See, Furnco Construction Corp. v. Waters*,

438 U.S. 567, 575 n. 7, 98 S.Ct. 2943, 2948 n. 7, 57 L.Ed.2d 957 (1978), and cases cited. Here, plaintiffs have alleged in essence that defendant High Top failed to hire women because they were women. This is an allegation of intentional discrimination, and it is incumbent on plaintiff to prove such intent. *Grano, supra,* slip op. at 1081.

### B. Disparate treatment theory.

■ (3) Under the disparate treatment theory, plaintiffs must prove by a preponderance of evidence that defendant High Top discriminated against women in hiring. *Grano, supra.* To do so, they must first make out a prima facie case of discrimination under Title VII. This may be done in one of two ways: either by proving a pattern or practice of discrimination by the employer, or by proving a *McDonnell-Douglas* case as to each alleged discriminatee.

### (1) Pattern or practice

■ (4) We hold that plaintiffs have failed to prove that High Top engaged in a pattern or practice of discrimination. Under *Teamsters, supra,* plaintiffs "had to establish by a preponderance of the evidence that . . . discrimination was the company's standard operating procedure—the regular rather than the unusual practice." 431 U.S. at 336, 97 S.Ct. at 1855. "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.* 431 U.S. at 335, n. 15, 97 S.Ct. at 1854 n. 15.

■ While a pattern or practice may be proved by use of statistics, the numbers of males and females employed by the defendant on a certain date cannot, without more, establish a pattern or practice. *Grano, supra,* at 1078. Plaintiffs must introduce evidence as to the relevant labor market. *Id.* Recognizing this, plaintiffs introduced statistics which purport to establish the availability of women for High Top jobs in Campbell County for the years 1974 through 1978. (Ex. 47; 18–22).[3]

We do not dispute the source or accuracy of these figures. However, we do not believe they accurately reflect the relevant labor pool. A careful analysis of the statistics reveals serious problems. The figures for 1974, 1975 and 1976 reflect the percentage of women in Campbell County actually employed in jobs falling into the "Operatives, Except Transport" Category. In the Index of Occupational Categories, published in Tennessee Data for Affirmative Action Plans, 6th Ed. at pp. 23–24 (Ex. 22), that category is broken down into some 42 subcategories, of which possibly five or six relate to the mining industry. In 1977 and 1978, the State modified its statistical presentation, which explains the sudden 25-point jump in "availability." The 65.2 and 63.4 figures reflect the percentage of Campbell County residents employed as "Operatives, Except Transport" who are women.

The 1978 figures are broken down into three subcategories: "Durable goods manufacturing," "nondurable goods manufacturing," and "nonmanufacturing." In 1978, there were thirty women in Campbell Coun-

3.

AVAILABILITY OF TOTAL FEMALES
IN THE OCCUPATION OF OPERATIVES,
EXCEPT TRANSPORT AND FEMALE OPERATIVES
EMPLOYED BY HIGH TOP

| | CAMPBELL COUNTY DISTRIBUTION TOTAL FEMALES IN OPERATIVES, EXCEPT TRANSPORT | FEMALE OPERATIVES, EXCEPT TRANSPORT EMPLOYED BY HIGH TOP COAL CO., INC. |
|---|---|---|
| 1974 | 39.8 | 0 |
| 1975 | 39.7 | 0 |
| 1976 | 39.7 | 0 |
| 1977 | 65.2 | 1 |
| 1978 | 63.4 | 0 |

ty who were employed as "Operatives, Except Transport" in the nonmanufacturing industry. That represents only a little more than 1% of the 2830 employed women then living in Campbell County. If we accept plaintiff's premise that that figure somehow reflects the relevant labor pool, then High Top is doing well in its hiring of women. Plaintiff's proof shows that at most a total of six women applied for jobs with High Top between 1974 and 1980, of which one was hired—or almost 17%.

■ Since plaintiffs have not defined the relevant labor market, we are unable to hold that they have sustained their burden of proving, by a preponderance of evidence, that High Top was engaged in a pattern or practice of discrimination. *Grano, supra,* at 1078–1079. In any event, we do not believe that the evidence justifies a finding of "pattern or practice" of the generalized and persistent nature contemplated by Congress. *See Teamsters, supra,* 431 U.S. at 336 n. 16, 97 S.Ct. 1855 n. 16.

### (2) McDonnell Douglas

(5) Since plaintiffs have failed to establish a pattern or practice of discrimination by High Top Coal Company, they may prevail only on behalf of those women with respect to whom they can prove individual instances of discrimination. *Grano, supra,* at 1079.

■ (6) In determining whether individuals were discriminated against, the proper framework for analysis is provided in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Under that case, plaintiffs have made out a prima facie case as to any applicant if they can show:

(a) that she belongs to a minority group,

(b) that she applied for and was qualified for a job for which the employer was seeking applicants,

(c) that despite her qualifications she was rejected, and

(d) that after rejection the job remained open and the employer continued to seek applicants from persons with her qualifications.

■ (7) With respect to Norma Jean Lester, Sylvia Lamb and Wilma Green, we hold that plaintiffs have failed to show that at the time they applied for work, High Top was seeking applicants for jobs. Norma Jean Lester admits that at the time she applied, the position of scale house operator was not available.

Wilma Green was told several times that there were no openings with High Top. It should be noted that Ms. Green applied only after Koppers purchased the mines. While High Top continued to operate the mines for some time, there is no evidence that it hired any new employees after Green applied. The first employee hired after Green applied was hired after South East Coal Co. took over operation of the facilities. (Ex. 51).

Similarly, there is no evidence that there were any openings at the time Sylvia Lamb applied. Nor is there any evidence that she ever even filled out an application. At her deposition, Ms. Lamb characterized the conversation she had with Foreman Kitts as "casual," but testified at trial that on reflection she had changed her mind about that.

■ (8) Our finding that Valerie Watkins and Sherry White never actually applied to High Top for a job precludes recovery by either of them.

For the foregoing reasons, we hold that plaintiffs have failed to make out a prima facie case of liability under any theory of recovery under Title VII. Our disposition of the case with regard to the liability of High Top makes it unnecessary for us to consider plaintiffs' claims against Koppers as successor employer.

Accordingly, it is ORDERED that judgment enter for the defendants in this case. It is further ORDERED that this case be, and the same hereby is, dismissed.

Order Accordingly.