[redacted]

**Kathleen KAHMANN, Plaintiff,**

**v.**

**Janet RENO, Attorney General of the United States; Doris Meissner, Commissioner of the Immigration and Naturalization Service, Defendants.**

**No. 94–CV–257.**

United States District Court,
N.D. New York.

May 31, 1996.

[redacted]

[redacted]

Kathleen Kahmann, Middleton, MA, pro se.

Hon. Janet Reno, Attorney General of the United States, Shawn B. Jensen, of counsel, U.S. Department of Justice, Civil Division, Washington, DC, for defendants.

## MEMORANDUM–DECISION & ORDER

HURD, United States Magistrate Judge.

### I. INTRODUCTION

The plaintiff, Kathleen Kahmann, filed her complaint on March 2, 1994. Plaintiff alleges that defendants discriminated against her in employment because of her sex, in violation of 42 U.S.C. § 2000e.[1] More specifically, plaintiff alleges that defendants failed to comply with a final Equal Employment Opportunity Commission ("EEOC") directive issued on August 29, 1989, and retaliated against her for her EEO activity, that is, filing the EEOC complaint and attempting to achieve compliance with the EEOC directive. Defendants timely answered, denying the allegations of the complaint.

### II. TRIAL

A two-day bench trial was conducted on November 21–22, 1995, in Utica, New York. The court reserved decision on all claims.

The plaintiff, pro se, was the sole witness in her case. Witnesses for the defendants

---

1. In a decision dated August 29, 1989, the EEOC found that the INS had discriminated against the plaintiff. The INS did not appeal that decision. Thus, the issue of sex discrimination per se is not before this court. *See infra* note 6. Rather, the issues before this court are failure to comply with the EEOC directive and retaliation.

were Miriam Griego ("Griego"), EEO Program Manager for the Eastern Region of the INS; Richard McCabe ("McCabe"), Port Director at the·Port of Champlain; John Bulger, Assistant District Director; and John J. Ingham, District Director. In addition to the exhibits received in evidence, the parties filed a Stipulation of Material Facts (Court's Exhibit 1).

Based upon all the evidence and the credibility of the witnesses, the court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52, Federal Rules of Civil Procedure.

## III. *FINDINGS OF FACT*

Plaintiff Kathleen Kahmann began working for the federal government in 1979 as a co-op student while she attended Bemidji State University in Duluth, Minnesota. At that time she worked as a trainee inspector for the U.S. Customs Service. After graduating with a Bachelor of Science degree in criminal justice, the U.S. Customs Service hired her as a full-time customs inspector at Grand Portage, Minnesota. While so employed plaintiff completed the officer U.S. Customs inspector training in Glynco, Georgia. She resigned when she relocated to New York State. In 1983 plaintiff was hired by the U.S. Immigration and Naturalization Service ("INS") at the port of Champlain, New York, as an intermittent immigration inspector. For the next few years plaintiff applied several times for a permanent, full-time position. During those years eight male intermittent inspectors were promoted to permanent, full-time positions. At the time of their hiring each of the eight males had less inspection time and less federal training than plaintiff had. In May 1985 plaintiff was turned down for promotion to a permanent, full-time position, while three less-qualified males were promoted from intermittent to permanent positions.

On July 1, 1985, plaintiff filed a complaint with the EEOC alleging that the INS discriminated against her based upon her sex in the May 1985 hiring of three less-qualified males. Plaintiff continued to work as an intermittent inspector until September 1986, after which she was not recalled to work by the INS.

The EEOC issued a final decision on August 29, 1989, finding that the INS had discriminated against the plaintiff because of her sex. That decision ordered the INS to provide a "make whole" remedy, including but not limited to offering plaintiff a position equivalent to that which she would have held but for the discriminatory conduct four years earlier. The EEOC ordered the INS to provide plaintiff with back pay plus interest, and any benefits, such as sick pay, which would have accrued but for the discrimination. Finally, the EEOC ordered the INS to submit a report of its corrective action within sixty days of receipt of the final decision. The INS did not appeal this order.

Meanwhile, prior to the EEOC final decision, plaintiff and her family had relocated to Jekyll Island, Georgia. The INS was aware of plaintiff's move.

As a result of the EEOC decision, on September 26, 1989, Griego sent plaintiff a letter offering her a position at GS–7, Step 1, the same grade plaintiff held when she was discriminated against in 1985. The next day Griego offered plaintiff a GS–9, Step 4 position at the Port of Champlain, by letter and telephone call. Griego advised plaintiff to ignore the September 26 letter. The September 27th letter provided a number at which plaintiff could reach Griego should she have any questions about her remedial relief.[2] Plaintiff was given 15 days to accept or reject the employment offer. In anticipation of a grant of maternity leave, plaintiff accepted the employment offer. Plaintiff requested a calculation of overtime, which would be included in her award of back pay, and her leave accrual. Plaintiff's maternity leave commenced immediately, and was comprised of sick leave, annual leave, and then Leave without Pay ("LWOP") after plaintiff's paid leave time was exhausted. It should be not-

**2.** As EEO Program Manager for the Eastern Region of the INS, Griego was responsible for implementation of the EEOC decision. Although plaintiff's case was the first EEOC finding of discrimination which Griego handled as an employee of INS, she had prior experience with other government agencies, such as the Department of the Army. Griego never notified plaintiff that she was the INS person responsible for implementation of the EEOC decision.

ed that plaintiff, in estimating her leave accrual, subtracted sick leave which she would have used for the births of her first and second children, which occurred during the time of her back pay award.

Plaintiff also continued to request discussions to determine her career placement and development, training requirements, ratings, and other benefits which would comprise a make whole remedy. Despite plaintiffs' continued questions, Griego did not hold any discussions with plaintiff on any of these issues. Nor did Griego contact other INS employees who she identified as being responsible for certain areas.[3]

In the fall of 1989, still not having received a back pay award, plaintiff called the EEOC.

The EEOC representative was told by an INS official that the INS did not want to pay plaintiff the back pay. The EEOC representative then made a phone call. That afternoon Griego contacted plaintiff, telling her that the award was forthcoming within a few weeks. However, it was not until seven months after the EEOC decision that INS tendered its back pay award to plaintiff. The same day that plaintiff received the award she contacted Griego, notifying her that the award was approximately $40,000.00 less than it should have been.[4] This underpayment necessitated further efforts by plaintiff and her attorney to obtain the full award ordered by the EEOC. Finally, six months later (thirteen months after the

---

**3.** For example, Griego testified that health insurance, life insurance, and the Thrift Savings Plan were "administrative" and handled by McCabe at the port of entry, rather than by her. During cross examination Griego testified as follows:
*BY MS. KAHMANN, CONTINUED:*
Q: For each and every year starting in 1986, if I had not been discriminated against, I would have received the opportunity to participate in all the benefits we have identified, the health insurance, the life insurance, the Thrift Savings Plan. I would have received an officer corps rating and an annual performance appraisal for the year 1986, the year 1987, the year 1988, and the year 1989; isn't that true?
A: Yes.
Q: Upon reinstatement in the fall of 1989, I did not receive any of those things; isn't that true?

    .    .    .    .    .

A: I did not send you anything relating to benefits.
THE COURT: No, that wasn't the question. The question was did she receive any of those benefits that she has just told you about after she was reinstated in August of 1989?
A: I really can't answer that question. I don't know.    .
THE COURT: Well, weren't you in charge of seeing what benefits she was entitled to and how they were to be implemented?
A: Not those particular benefits. Those are administrative, and those would be handled at the port of entry, sir.
THE COURT: By Mr. McCabe?
A: Yes, sir.
THE COURT: And did you ever contact Mr. McCabe as part of your job in implementing this decision to determine what, if anything, he had done as far as benefits were concerned?
THE WITNESS: Not regarding benefits, sir, no.
THE COURT: And you never made any effort to find out what he may have done as part of

your job in implementing this decision, is that what you are saying?
THE WITNESS: Sir, we talked about other issues, For example,—
THE COURT: No, I am asking you, did you talk to him about—
THE WITNESS: Benefits, no.
THE COURT: And you understood that he was the one that would have to implement these kinds of benefits?
THE WITNESS: That is correct.
(Tr. Nov. 21, 1995, at 116–18.)

**4.** One of the items in contention was the calculation of overtime and night differential pay which should have been included in the back pay award. Although Griego testified that upon receiving the EEOC decision she contacted the port of Champlain to obtain average overtime figures, those figures conflicted with the amount of overtime pay awarded to plaintiff. McCabe notified Griego that the average inspector worked 245 overtime days during plaintiff's back pay period. However, she was paid only $4,268.88 ($2.18 per hour if based upon 245 days) for overtime during the back pay period. Griego insisted that plaintiff's back pay had been correctly calculated. Plaintiff's letter of May 17, 1990, to Griego clearly sets forth the discrepancy in the calculations and the solution. For example, according to McCabe the average number of overtime days for 1988 was 55. (*See* Pl.'s Ex. 24.) Yet Griego paid plaintiff for only 5 overtime days for that year. Thus, while calculation of the correct back pay award would have been straightforward and resolution of the dispute could have taken place quickly, Griego failed to do so. Moreover, plaintiff's attorney had provided estimated overtime work for plaintiff's back pay period as early as October 16, 1989. (*See* Def.'s Ex. 4.) It is apparent that rather than expedite plaintiff's back pay award, as was her responsibility as EEO Program Manager, Griego was lackadaisical at best.

EEOC decision), the INS paid plaintiff $39,-443.00 in additional back pay. The INS, however, still refused to pay interest on the back pay award as ordered by the EEOC.

During this time plaintiff and her attorney continued to attempt to resolve the still-open issues regarding the make-whole remedy, such as career placement, calculation of accrued leave time, insurance benefits, ratings, and training. Absolutely no correspondence from the INS addressed these additional issues which required resolution. No discussions took place which would lead to resolution of these issues despite repeated requests from plaintiff and her attorney.[5]

In July 1990 the INS wrote to plaintiff asking about her employment plans. Plaintiff requested additional LWOP to attempt to transfer. Plaintiff also continued to request Immigration Inspector Training at Glynco, Georgia, as part of her make whole remedy. In August 1990 the INS ordered plaintiff to report for duty on August 27, 1990, at the port of Champlain. Plaintiff again requested training in response to the August letter. By letter of November 7, 1990, McCabe refused to send plaintiff to training in Glynco, and ordered plaintiff to report for duty at the port of Champlain on December 3, 1990. McCabe refused training at Glynco, stating that all appropriate training would be completed at the port, despite the fact that other newly-hired full time immigration inspectors were sent to Glynco for the training shortly after entering duty. The November letter also included a "balance sheet" showing plaintiff's leave accrual and usage. On November 30, 1990, plaintiff's attorney again requested training for plaintiff at Glynco and made a Freedom of Information Act request for training records of the three males hired as immigration inspectors in May 1985. On January 11, 1991, the INS notified plaintiff that she was to attend training in Glynco.

Plaintiff was returned to paid status at the start of that course.

The INS required that plaintiff reside in a dormitory at the training center during the course despite the fact that plaintiff resided within commuting distance. Authorities at the training center threatened plaintiff with enforcement of the dormitory requirement at the direction of the Eastern Region, of which the port of Champlain was a part. The training center had not enforced its dormitory residence requirement on other trainees living within commuting distance and had not threatened other trainees with bed checks for enforcement.

On April 16, 1991, plaintiff graduated from the immigration inspector training. She finished the eleven-week course with an 87.48 average. Plaintiff then began the Spanish language training which was given in conjunction with the inspector training.

On April 26, 1991, plaintiff notified responsible individuals at the training facility in Glynco that she was suffering from an extended illness and would not be able to complete the Spanish language training. Plaintiff attempted to see a doctor at the training facility but was unsuccessful. She returned to her home to seek medical care. Sometime later plaintiff returned, by mail, the key to her dormitory room at the training center. On April 29, 1991, INS placed plaintiff on Absent without Leave ("AWOL") status. On May 6, 1991, plaintiff requested a six-month LWOP in order to secure a transfer to a port other than Champlain. Plaintiff further requested that INS remove a reference in her Appraisal cover sheet, dated 1991, stating that plaintiff had not worked at the Port of Champlain since 1986.

The Appraisal cover sheet was required to accompany any request for promotion or

---

5. Griego apparently believed that it was unnecessary to meet with plaintiff or to provide plaintiff with any benefits other than lost earnings back pay and accrued leave. (Tr. at 97–98.) Griego testified on direct examination:

Q: Do you believe that Ms. Kahmann received all of the back pay, leave, retroactive promotions, interest and other relief she was entitled to under the EEOC decision in August of 1989?

A: Yes, I do.

.    .    .    .    .

Q: Ms. Griego, did you intend the offer of the position in [your letter of September 29, 1989] to be in complete compliance with the EEOC decision in August of 1989?

A: Yes.

(Tr. Nov. 21, 1995, at 98, 108).

transfer. Plaintiff requested the Appraisal for a position opening for which she wished to apply. Plaintiff later learned that McCabe, Port Director at Champlain, had refused to provide an officer corps rating which was also required for any transfer or promotion. Further, although McCabe deleted the reference to plaintiff not working there since 1986, as plaintiff requested, he also changed "highly recommended" to the next lower ranking and removed all other positive comments which were on the cover sheet. INS also informed at least one of plaintiff's potential new supervisors that plaintiff had engaged in protected activity, i.e., pursuit of a sex discrimination claim. These actions by INS employees effectively prevented plaintiff from receiving a transfer.

The three male employees hired in 1985 at the time of the discrimination against plaintiff all attended training at Glynco, Georgia. At least one of them, Scott Leahy, received a transfer approximately one year after being hired as a full time employee. After almost two years in the private sector, Mr. Leahy applied for and received a position as immigration inspector in June 1990, at a different duty station. Fourteen months later he was promoted to a GS–11, and 20 months after that he was promoted to a supervisory position at GS–12.

In August 1991 Mr. Bulger, Deputy District Director of INS, proposed the termination of plaintiff's employment due to excessive unauthorized absenteeism and noncompliance with policies and instructions issued by the service. Plaintiff responded in September 1991, complaining about the lack of an Annual Performance Rating and the changes to plaintiff's Appraisal cover sheet, among other things, and requesting that she not be terminated. On December 2, 1991, INS notified plaintiff that she would be terminated

from employment effective December 13, 1991.

From the time of the original favorable EEOC determination until her termination on December 13, 1991, plaintiff repeatedly notified the INS of the ways in which their mere offer of reinstatement to a GS–9 position at Champlain did not comply with the EEOC make whole remedy, particularly in the area of promotion and transfer opportunity. Other than to send plaintiff, at her request, to the training program at Glynco, Georgia, the INS did not respond to plaintiff's complaints except with "orders" for her to report to duty at the port of Champlain.

In February 1992 plaintiff again relocated with her family, to Boston, Massachusetts. In July 1992 plaintiff filed suit in the United States District Court for the Northern District of New York, seeking interest on her back pay award, which the INS had refused to pay. On October 15, 1993, the Honorable Con G. Cholakis granted plaintiff's motion for summary judgment and ordered the INS to pay the interest on the back pay award as previously directed by the EEOC. In December 1993 the EEOC rendered an adverse decision on plaintiff's petition for enforcement of the EEOC order, finding that the INS had fulfilled its requirement to offer plaintiff a full time Immigration Inspector position. On March 2, 1994, plaintiff filed the instant action. INS never filed the completion report required by the EEOC order of August 1989.

## IV. CONCLUSIONS OF LAW

### A. Compliance with August 1989 EEOC Order

■ The remedy ordered by the EEOC in August 1989 was to make the plaintiff whole [6]; that is, to put her in the position she would have been in but for the discrimi-

---

6. Although an EEOC decision does not have preclusive effect in federal court, none of the parties challenge the EEOC finding of sex discrimination pertaining to the INS's failure to hire plaintiff for a permanent inspector position in 1985. *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 470 n. 7, 102 S.Ct. 1883, 1891 n. 7, 72 L.Ed.2d 262 (1982). Based upon the plethora of evidence supporting the finding of discrimination and the

lack of challenge to that finding, this court's decision herein is based upon the finding that the INS did discriminate against the plaintiff based upon her gender when it hired three less qualified males for permanent positions in 1985. Likewise, the make whole remedy ordered by the EEOC is unchallenged and this court bases its decision upon the finding that the make whole remedy was appropriate in this case.

nation.[7] Remedial actions by a federal agency, such as INS, necessitated by a make whole remedy may include Nondiscriminatory Placement to a position that the discriminatee would have occupied but for the discrimination; back pay awards; retroactive promotions; expunction of unwarranted disciplinary action from personnel records; and opportunities to participate in any denied benefits, such as training, preferential work assignments and overtime scheduling. 29 C.F.R. § 1613.271 (1995). "The Nondiscriminatory Placement may take place by initial employment, reinstatement, promotion, transfer or reassignment and must occur without any prejudice to, or loss of, any employment-related rights or privileges the discriminatee would have otherwise acquired had the discrimination not occurred." 29 C.F.R. Pt. 1613, App. A. When determining what the proper placement of the discriminatee should be, uncertainties must be resolved in favor of the discriminatee and against the discriminator. *Claiborne v. Illinois Central R.R.*, 583 F.2d 143, 153 (5th Cir.1978), *cert. denied*, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979). Furthermore, although the discriminatee cannot dictate the conditions of the placement, comparison to the terms of employment of an employee outside the protected class provide an appropriate guide. *See Cross v. National Trust Life Ins. Co.*, 553 F.2d 1026, 1030 (6th Cir.1977). In addition to lost earnings, a back pay award must include other lost benefits such as insurance and pension. 29 C.F.R. Pt. 1613, App. A.[8]

The INS has paid the plaintiff lost earnings back pay. However, initially the payment was almost $40,000.00 less than it should have been. This initial payment was not made until seven months after receipt of the EEOC decision. The additional payment was not made until thirteen months after the EEOC decision. The delayed payment of plaintiff's lost earnings occurred despite the

---

7. The EEOC concluded that "[h]aving proven her claim of sex discrimination, appellant is entitled to a 'make whole' remedy, placing her in the position she would have been in absent discrimination. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)." (Def.'s Ex. 1.) The EEOC went on to direct the INS to take corrective action as set forth below:

ORDER

A. Within 30 days of its receipt of this decision and order, the agency shall, pursuant to 29 C.F.R. § 1613.271(c)(1), offer appellant a full-time Immigration Inspector position. Appellant shall receive backpay with interest, commencing from the earliest date Selectees 1, 2, or 3 began a full-time position, *and all other benefits she would have received in the absence of discrimination.* These benefits include, but are not limited to, seniority and leave accrual. Backpay shall be calculated as set forth in 5 C.F.R. § 550.805.

B. Reasonable attorney's fees shall be awarded in accordance with 29 C.F.R. § 1613.271(d).

. . . . .

Under EEOC Regulations, *compliance with the Commission's corrective action is mandatory.* Unless the agency requests reconsideration of this decision within 30 days of its receipt, *the agency must report completion of the corrective action to this Commission within 60 calendar days* of receipt of this decision. *See* 29 C.F.R. Section 1613.237(b) and (d); 52 Fed.Reg. 41928 (October 30, 1987). The agency's report should be forwarded to the Director of Compliance, Office of Review and Appeals....

*A copy of this report should be sent to the appellant.*
*Id.* (emphasis added).

8. The regulations provide for back pay as follows:

*Backpay.*
Each identified victim of discrimination is entitled to be made whole for any loss of earnings the discriminatee may have suffered by reason of the discrimination. Each individual discriminatee must receive a sum of money equal to what would have been earned by the discriminatee in the employment lost through discrimination ("Gross Backpay") less what was actually earned from other employment during the period, after normal expenses incurred in seeking and holding the interim employment have been deducted ("Net Interim Earnings"). The difference between Gross Backpay and Net Interim Earnings is Net Backpay Due. Net Backpay accrues from the date of discrimination, except where the statutes limit the recovery, until the discrimination against the individual has been remedied.

Gross Backpay includes all forms of compensation such as wages, bonuses, vacation pay, *and all other elements of reimbursement and fringe benefits such as pension and health insurance.* Gross Backpay must also reflect fluctuations in working time, overtime rates, changing rates of pay, transfers, promotions, and other perquisites of employment that the discriminatee would have enjoyed but for the discrimination.
*Id.* (emphasis added).

EEOC order of *completion*[9] of corrective action within 60 days.[10] Furthermore, plaintiff was forced to file suit in federal court in order to receive the interest on the back pay which the EEOC ordered. Thus, the INS is now in compliance, albeit grudgingly, with the EEOC order as to back pay of lost earnings, with interest. However, no other lost benefits, such as insurance and pension, were included in the back pay award.

As to nondiscriminatory placement, the INS falls short of compliance with the make whole remedy ordered by the EEOC. The INS offered plaintiff a GS–9 immigration inspector position. Although the employment offer was to be unconditional, the INS placed the condition of plaintiff's return to the port of Champlain. Although plaintiff accepted the offer, she did so with the understanding that she would be placed on maternity leave status. Plaintiff believed that during her maternity leave issues regarding her career development and placement within the INS would be resolved. However, despite repeated requests by plaintiff, Griego held no meetings with the plaintiff or her attorney in order to discuss these details and determine the terms and conditions of plaintiff's employment. Griego accomplished only the bare minimum corrective action by offering plaintiff the GS–9 immigration inspector position at Champlain. This offer failed to take into consideration any transfer or promotion plaintiff would have applied for in the absence of the discrimination.[11] It is difficult to understand how Griego could have determined the appropriate nondiscriminatory placement in the complete absence of dialogue with the plaintiff. Furthermore, had plaintiff rejected this non-complying offer, any remedy she had would have been terminated and the favorable decision of the EEOC would have been negated. Thus, it was necessary for plaintiff to accept the non-complying offer in order to preserve her remedy under the EEOC decision, and she appropriately did so. In any event, the plaintiff never made an unconditional acceptance of the offer as being in full satisfaction of the EEOC directive to the INS. In fact,

9. On cross-examination Griego insisted that the EEOC order required only *implementation* of the corrective action within 60 days, rather than completion.

Q: Do you see where it is talking about the Agency's responsibility to report completion of corrective action to the commission within sixty days from receipt of that decision?
A: Yes, I see that.
Q: Isn't it true that the Agency received the decision September 1, 1989, pursuant to the stamp on its copy?
A: Yes.
Q: Isn't it true that the Agency failed to implement the decision within that sixty day time period?
A: *It says implement, it does not say complete.*
Q: Excuse me. It states—doesn't it state, and I quote, "the Agency must report *completion* of the corrective action to this commission within sixty calendar days of receipt of this decision." True?
A: Yes.
Q: And it is true the Agency did not report completion within sixty days to the commission?
A: That is correct.
(Tr. Nov. 21, 1995, at 120–21 (emphasis added).)

10. Griego testified that the delay was caused by her need to gather information from various sources in order to determine the appropriate amount of back pay due to plaintiff. The court will not credit Griego's excuse for the delay, particularly in light of the demonstrated ability of plaintiff to determine her appropriate salary levels and estimated overtime hours within six weeks of the decision. *See supra* note 4. Griego, as EEO program manager, should have made every effort to expedite plaintiff's back pay award. Not only did Griego fail to expedite the award, but she calculated it incorrectly, requiring another six months to provide a correct payment to plaintiff.

11. The applicable regulations require Nondiscriminatory Placement as follows:

Each identified victim of discrimination is entitled to an immediate and unconditional offer of placement in the respondent's workforce, to the position the discriminatee would have occupied absent discrimination, or to a substantially equivalent position, even if the placement of the discriminatee results in the displacement of another of respondent's employees ("Nondiscriminatory Placement"). The Nondiscriminatory Placement may take place by initial employment, reinstatement, promotion, transfer or reassignment and must occur without any prejudice to, or loss of, any employment-related rights or privileges the discriminatee would have otherwise acquired had the discrimination not occurred.

29 C.F.R. Pt. 1613, App. A.; *see also Claiborne,* 583 F.2d at 153 (resolve uncertainties regarding proper placement in favor of discriminatee).

plaintiff then endeavored to exact compliance from the INS, albeit without success.

■ Furthermore, plaintiff was in a position to apply for openings at four ports near her new residence. Plaintiff's attempts to secure a transfer were thwarted by INS employees. The INS refused to provide an officer corps rating for plaintiff and provided an annual appraisal in 1991 which mentioned that plaintiff had not worked at the Port of Champlain since 1986. Additionally, INS improperly disclosed plaintiff's EEO activity on at least three occasions.[12] These actions by the INS effectively prohibited plaintiff from transferring to a port other than the one at which the discrimination occurred. Any other immigration inspector with plaintiff's ratings and experience would have been eligible for transfer, and promotion, and the INS would have encouraged and assisted that inspector in obtaining the sought-after transfer. Thus, the INS failed to comply with the EEOC order by failing to provide plaintiff with transfer and promotion opportunities, which is the position she would have been in but for the discrimination.

The INS refused to send plaintiff to the immigration inspector training school to which the three male inspectors who were hired in 1985 were sent shortly after their permanent appointments. This failure was in direct contravention of the EEOC order and the regulations pertaining to remedial actions for discrimination at federal agencies. See 29 C.F.R. § 1613.271(c)(5). The INS finally capitulated and provided for plaintiff

to attend the training. Defendants argue that plaintiff was absent without leave when she failed to complete the Spanish language portion of the inspector training program in which she was enrolled. However, based upon the INS's previous grants of leave, both paid and unpaid, the assurances of the authorities at the program that plaintiff would be able to complete the Spanish language training at another time, and the INS policy of returning ill employees to their duty stations, the AWOL argument must fail. It is apparent that placing plaintiff in this AWOL status was yet another attempt by INS to avoid compliance with the EEOC directive by failing to provide benefits to which plaintiff was entitled and to prevent plaintiff from returning to work for the INS.

■ The INS also failed to comply by restoring benefits to which plaintiff was entitled. Although plaintiff's accrued sick leave and annual leave was reinstated, the INS did not provide an accounting to plaintiff until November 1990, more than one year after she requested it and after this accumulated leave was exhausted during her maternity leave. Further, the INS failed to provide plaintiff with other benefits such as the thrift savings plan, health insurance, and life insurance, which are available to other permanent immigration inspectors. Defendants point to a form which plaintiff signed in 1986 declining these benefits. However, plaintiff signed this form while she was still an intermittent employee, and before the favorable EEOC

---

12. For example, McCabe told a supervisor hiring for a position to which plaintiff had requested a transfer about her absence from work from 1986 to 1989, and explained that it was due to plaintiff's EEO action and her ordered reinstatement. In a memorandum dated October 29, 1991, summarizing his latest dealings with plaintiff, McCabe wrote

> On July 19th I called Nancy Weir to find out the vacancy number for the Records job. In the course of the conversation Ms. Weir mentioned that since it was MSPII it required a copy of Inspector Kahmann's latest Performance rating. I told her that there wasn't one for the past year. She asked why not. I explained that Katy had not actually worked as an inspector since 1986. I briefly explained the circumstances of Katy's case. She then quoted to me from Katy's application form. The application stated that she had been work-

ing continuously as an inspector. I told her this was not true. . . . On August 26 I received a phone call from Katy. She was very upset about the G–610s I prepared in June. She had talked to Nancy Weir. She said that Nancy Weir told her that she would have been selected for one of those positions except for the poor rating that I had given her.

(Pl.'s Ex. 13.) It also became apparent during cross examination that Griego never told McCabe that plaintiff's reinstatement was retroactive to April 1985.

> Q: It was your understanding that I had become an employee October 22, 1989, and that it was not retroactive to April 1985 when the discrimination first began?
> A: The only retroactivity was my providing figures for leave balances and for money for overtime that you would have received during that time.

ruling. The circumstances of an intermittent employee and a permanent employee are sufficiently different that in order to place plaintiff, as nearly as possible, in the position she would have been in but for the discrimination, it was necessary to offer participation in the insurance and savings benefit plans at the time of the offer of reinstatement, in September 1989. Moreover, plaintiff's back pay award should have included amounts to compensate her for losses due to not having life and health insurance plans, and for benefits she would have received through participation in the Federal Employees Retirement System ("FERS") and the Thrift Savings Plan ("TSP").

Finally, although technical in nature, the INS failed to comply with the timing requirements in cases of discrimination by a federal agency. First, the INS failed to complete its investigation and determination of the EEO complaint within the 180 day limit. *See* 29 C.F.R. § 1613.220(a). Rather, the agency evaluation process consumed two and one half years. Second, the agency regulations require completion of corrective action within sixty days after the final EEOC decision. § 1613.237(c); *supra* note 6. In this case, the corrective action is still not completed almost seven years after the EEOC decision was rendered, and eleven years after the discrimination occurred. Third, the EEOC order requires that a report detailing the corrective action completed be provided to the EEOC within sixty days of the decision. This completion report still had not been filed as of the date of trial.[13]

Based upon the foregoing, the court concludes that the INS did not take the remedial actions required by the EEOC order; therefore, the INS failed to comply with the EEOC order.

**B. Retaliatory Discharge**

■ A prima facie case of retaliation may be established by showing "participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action." *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991). Once plaintiff establishes a prima facie case, the defendant has the burden of producing evidence of a legitimate, nondiscriminatory reason for the employment action. *Id.* If defendant meets this burden, then plaintiff must establish that the proffered legitimate reason was pretextual. *Id.*

■ First, the INS certainly knew of plaintiff's protected EEO activity. Second, the INS termination of plaintiff's employment was disadvantaging to plaintiff. Third, plaintiff has established a causal connection between her EEO activity and her termination from INS employment. Plaintiff pressed the INS continuously from the time of the EEOC favorable decision in August 1989 until this suit was filed to fully comply with the EEOC make whole remedy. INS's reluctance and refusals to take the appropriate remedial actions forced plaintiff to insist upon what was her due. Some portions of the make whole remedy which plaintiff's persistence led INS to provide include a full back pay award,[14] interest on back pay,[15] and

---

**13.** Griego testified that she did complete a report of corrective action being taken which was suitable for filing with the EEOC. According to Griego, she authored the report sometime in the spring of 1990 and forwarded it to her headquarters. She did not file the report with the EEOC, as that was the responsibility of headquarters. The defendants never produced this report at trial, and copies were not sent to plaintiff as required by the EEOC order. The court therefore must presume either that Griego's testimony that she prepared such a report is not credible and in reality a report was not prepared, or that the report was prepared and it showed that the INS failed to comply with the EEOC order of August 29, 1989.

**14.** The INS made an initial payment for lost earnings back pay seven months after the EEOC favorable decision. However, this was an underpayment of approximately $40,000.00. The full amount of lost earnings was not paid until 13 months after the EEOC order. Moreover, plaintiff's back pay award included only lost earnings, and did not compensate her for other lost benefits, such as life insurance, health insurance, and pension.

**15.** Although the INS did finally comply with the order to pay interest on plaintiff's back pay award, it did so only after plaintiff brought an action in United States District Court and the Court ordered the payment.

immigration officer training. Other components of appropriate remedial action remain unprovided, such as insurance benefits, participation in the thrift savings plan, and opportunity for transfer and promotion. The INS has, from the beginning, fought compliance with the EEOC order.[16] Thus, plaintiff's termination was concurrent with her attempts to obtain compliance, and the termination theoretically cut off INS's need to comply with the order. Plaintiff has established each element of a prima facie case.

The INS proffers two legitimate reasons for the termination. First, INS claims that plaintiff had excessive unauthorized absences. Second, INS cites noncompliance with its policies and instructions. The INS therefore argues that terminating plaintiff was necessary for work scheduling and planning.

■ Plaintiff has shown that these reasons for her termination were merely pretext for retaliating against her EEO activity. From October 1989 until the time of her termination in December 1991 plaintiff repeatedly requested leaves of absence—first a maternity leave, then leaves without pay. The INS intermittently approved these leaves of absence, or denied them and ordered plaintiff to report for duty at the port of Champlain. After acquiescence to plaintiff's failure to report for duty as "ordered" for more than two years, the INS is now estopped from claiming that this failure is a legitimate ground for terminating plaintiff. Nor can INS claim that after two years of leaves of absence and plaintiff not following orders to report for work, that her failure to report for work in August 1991 was so significant that termination was necessary for work scheduling and planning.[17]

■ Additionally, the INS was well aware of plaintiff's relocation, and would have helped effect a transfer for any other employee in the position plaintiff would have been in but for the discrimination.[18] The foot-dragging that INS exhibited in the areas of the EEOC order with which it did comply also indicates that the proffered reasons for

16. For example, despite her responsibility for implementing the EEOC order, Griego never provided benefit information to the plaintiff. Griego testified on cross examination by Ms. Kahmann:

Q: You had the responsibility—isn't it true that the Agency had the responsibility within thirty days from the enter on duty date to provide me with the opportunity to elect health insurance?
A: Yes.

. . . . .

Q: Isn't it also true that you or anyone else working with you to implement this decision, that none of you brought forth health insurance benefits to me within that thirty-day time period; isn't that true?
A: Yes.
Q: Isn't it also true with the other employment benefits that I was entitled to within thirty days of enter on duty, which would have been at least the second week in October of 1989, that no agency official brought forth the information to allow me to elect life insurance benefits, to enroll in Thrift Savings Plans; isn't that true?
A: Yes.
(Tr. Nov. 21, 1995, at 133–34.) Thus, despite Griego's knowledge that plaintiff should have received these benefits, in fact from the retroactive enter on duty date of May 26, 1985, Griego failed to make any effort whatsoever to assure that plaintiff was provided with these benefits in order to comply with the EEOC order.

Additionally, the INS initially told the EEOC that it did not want to pay plaintiff back pay even though compliance with the EEOC order was mandatory. The INS also refused to pay plaintiff interest on her back pay award as directed by the EEOC, until it was under court order to do so. Griego failed miserably in implementing the corrective action ordered by the EEOC.

17. It is also clear that work scheduling and planning did not play a part in plaintiff's assignment to Champlain upon her reinstatement. Griego offered plaintiff the position in Champlain without consulting the port director. In fact, Griego did not even inform McCabe of the offer until after plaintiff accepted it. To now claim that work scheduling and planning was a legitimate reason for the plaintiff's termination is ludicrous.

18. The INS routinely provided the necessary performance appraisals and officer corps ratings for employees attempting to transfer, but refused to do so for plaintiff. These forms were also provided for former employees wishing to return to service. For example, the proper forms were provided to Scott Leahy when he transferred initially, and again when he wished to reenter service after working in the private sector. In contrast, McCabe refused to provide the needed paperwork for plaintiff to transfer, and even told a potential supervisor about plaintiff's EEO activity. See supra note 12.

plaintiff's termination were pretextual, and that the true reasons were plaintiff's EEO activity and a method of avoiding compliance with the EEOC order.[19] Finally, the INS's failure to fully comply with the August 1989 EEOC order justifies plaintiff's failure to report to the port of Champlain. The INS simply cannot claim that while it continued to refuse plaintiff's requests for compliance with the EEOC make whole remedy,[20] plaintiff was required to report for duty in accordance with a non-complying job offer. *See Claiborne*, 583 F.2d at 153. Plaintiff was not required to accept a conditional job offer or forfeit the remedy ordered by the EEOC. Failure to report for the GS–9 position in Champlain may reflect a failure of plaintiff to mitigate her damages, but it does not bear on the merits of her claim. *See Babrocky v. Jewel Food Co.*, 773 F.2d 857, 868 (7th Cir. 1985); *Claiborne*, 583 F.2d at 153. Moreover, it was appropriate for plaintiff to accept the non-complying offer to preserve her position with the INS, and then attempt to work out compliance, particularly in light of the immediate commencement of her leave status and her knowledge of other employees' transfers.

In sum, while plaintiff was attempting to obtain the full remedy ordered by EEOC, the INS did its utmost to avoid compliance.

Finally, the INS retaliated against the plaintiff for her protected activity and terminated her on December 13, 1991.

## V. *Remedy*

■■■■■■ The court may order back pay, reinstatement, and "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g). Any order for back pay must be reduced by "[i]nterim earnings or amounts earnable with reasonable diligence." *Id.* The burden is upon the defendant to prove that the discriminatee failed to mitigate damages. *Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir.1992); *Bonura v. Chase Manhattan Bank, N.A.*, 629 F.Supp. 353, 356 (S.D.N.Y.1986). A defendant "'must show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment'" in order to meet its "extremely high" burden of proving failure to mitigate. *Bonura*, 629 F.Supp. at 356 (quoting *EEOC v. Kallir, Philips, Ross, Inc.*, 420 F.Supp. 919, 925 (S.D.N.Y.1976), *aff'd*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977)). A back pay award must include lost fringe benefits, such as insurance and pension, in addition to lost earnings. 28 C.F.R. Pt. 1613, App. A.[21]

---

**19.** Examples are the late payment of the back pay award, incorrect calculation of the back pay award, refusal to pay interest on the back pay award, refusal to send plaintiff to training provided to other inspectors in her position, and failure to offer the opportunity to participate in employee benefit plans.

**20.** Griego testified on cross examination as follows:

> Q: Referring to both of these letters, which you mailed to me September 26th and September 27th, and also referring to the phone call you made to me September 27, 1989, both of these documents had been typed up when you telephoned me; isn't that true?
> A: That is correct.
> Q: Prior to that phone call, isn't it true you had never spoken to either me or my attorney regarding the make-whole remedy or where my position would be located pursuant to the EEOC order?

> A: That is correct.
>
> .   .    .     .      .
>
> Q: At no time either prior to August 29, 1989, or after did you meet with me to discuss the course my career would have been had the discrimination not occurred?
> A: No.
> Q: At no time did you talk to my attorney or write to my attorney to ascertain where or what positions I would have put in for during that four and a half year period; isn't that true?
> A: Yes.

(Tr. Nov. 21, 1995, at 142–43.) Griego's testimony demonstrates the lack of any effort to fully comply with the make whole remedy ordered by the EEOC. In order to fully comply, it would have been necessary to determine plaintiff's career development, preferably through discussions with the plaintiff. It seems as though a face-to-face meeting would be the most effective method of achieving this.

**21.** See *supra* note 8 for the text of the regulation.

■ In this case the defendants failed to put forth any evidence which might show that plaintiff failed to mitigate her damages after her termination on December 13, 1991. Thus, the defendants failed to meet their burden and the court will award back pay. Because plaintiff was paid for certain periods prior to her termination on December 13, 1991, and during the other periods she was on leave without pay status at her request,[22] the court finds that the award of back pay will begin on the date of plaintiff's official termination, December 13, 1991, and continue up to the time of reinstatement. The court finds that but for the discrimination the plaintiff would have received a transfer to Georgia prior to 1991, and a transfer to Boston, Massachusetts in 1992. The court further finds that the plaintiff would have earned the salaries listed in the chart below but for the discrimination.[23]

| Time Period | Lost Earnings |
| --- | --- |
| 12/13/91 to 12/31/91 | $ 1,178.67 |
| 1/1/92 to 12/31/92 | 30,109.54 |
| 1/1/93 to 12/31/93 | 31,493.00 |
| 1/1/94 to 12/31/94 | 33,907.33 |
| 1/1/95 to 12/31/95 | 35,375.00 |
| 1/1/96 to 6/30/96 | 21,973.00 |
| Total | 154,036.54 |

The court finds that plaintiff is entitled to lost earnings back pay of $154,036.54, as well as prejudgment interest [24] compounded annually, for a total back pay award of $197,-559.34. Additionally, in order to place plaintiff as nearly as possible in the position she would have been in but for discrimination, the court finds that it is appropriate to order reinstatement as of July 1, 1996, to an Immigration Inspector position in Boston, Massachusetts at a Grade 11 Step 1. Plaintiff is also entitled to accumulated annual and sick leave from December 13, 1991, until the date of her reinstatement.

Additionally, plaintiff would have been part of the FERS beginning May 26, 1985, but for the discrimination. As a FERS participant, a deduction would have been made from plaintiff's pay for the basic annuity component of FERS. Thus, in order to make plaintiff whole, the INS must establish a FERS basic annuity account for plaintiff, and deposit in that account the amount which would have been deposited but for the discrimination. This amount must be determined based upon the prior back pay award for the period from May 26, 1985, until September 1989, and upon the lost earnings of $154,036.54 for the period from December 13, 1991, until the date of reinstatement. The court finds that no contributions need be made for the period of plaintiff's maternity leave, leave without pay, and training time. In addition to the INS contribution to the basic annuity component of FERS, plaintiff would have been required to make a small contribution. Therefore, the INS must calculate plaintiff's contribution for the periods stated above and deposit that amount in plaintiff's basic annuity FERS account. The INS deposit of plaintiff's contribution to her FERS account will reduce the amount of payment directly to plaintiff which is required to satisfy this judgment.

■ The TSP is an optional component of FERS. Employees may make contributions of up to ten percent of their basic pay. The employer automatically contributes one percent of the employees basic pay whether or not the employee elects to contribute. If the employee does elect to contribute, the employer contributes additional matching funds. An employee may elect to participate in TSP during the second open season after becoming a permanent employee. Thus, plaintiff is entitled to a TSP account with one percent of her basic pay for the period of November 15,

---

**22.** Plaintiff has failed to show proof of any loss during the periods of LWOP because she was in that status voluntarily.

**23.** These lost earnings are based upon the following grade levels:

| | |
| --- | --- |
| 12/13/91 until 4/13/92 | Grade 9, Step 4 |
| 4/13/92 until 4/13/94 | Grade 9, Step 5 |
| 4/13/94 until 1/1/96 | Grade 9, Step 6 |
| 1/1/96 until 6/30/96 | Grade 11, Step 1 |

Additionally, plaintiff's salary would have been based upon the Locality Pay Table for Boston, Massachusetts beginning in 1994 when the locality pay differentials were implemented.

**24.** The interest rates of 10% for the last quarter of 1991, 8% for 1992, 7% for 1993, 7.75% for 1994, 9.25% for 1995, and 8% for the first two quarters of 1996, are based upon the federal short-term underpayment of taxes rates as set forth in 26 U.S.C.A. § 6621 (Supp.1996).

1986 (the second open season after discriminatory refusal to hire) until September 1989, and from December 13, 1991, until the date of reinstatement, to be contributed by the INS. Additionally, plaintiff may elect to contribute an additional percentage of her basic pay for those time periods. If plaintiff so elects, the INS must contribute its appropriate matching contributions. The amount of the prior back pay award must be used for the purposes of calculating TSP contributions for the period of November 15, 1986 until September 1989, and this court's back pay award of $154,036.54 for the period from December 13, 1991, until the date of reinstatement.

■ Plaintiff also claims that health and life insurance benefits were lost due to the discriminatory conduct by defendants. However, plaintiff failed to submit any proof that her lack of health insurance, for which she would have been eligible as a government employee, left her in any different position than she would have been in had she obtained that insurance. Further, although there was some testimony as to a J.C. Penney life insurance policy, neither the face value or the annual premium was submitted into evidence. Thus, the court declines to make an award for health and life insurance benefits.

■ Plaintiff is entitled to the expunction from her employee records any reference to her EEO claim and unwarranted disciplinary actions taken, such as her termination. Furthermore, the INS must provide annual performance reviews and officer corps ratings, as well as any other documentation needed for promotion or transfer, for the period from May 26, 1985, until the date of the reinstatement. These documents will reflect a "fully successful" performance level or better.

Accordingly, it is

ORDERED that

1. Plaintiff is awarded the sum of $197,559.34, against defendants.

2. Plaintiff be reinstated by the defendants to a position with the Immigration and Naturalization Service in Boston, Massachusetts, at Grade 11, Step 1, as of July 1, 1996;

3. Defendants will provide to plaintiff the opportunity to elect health and life insurance benefits upon her reinstatement;

4. Defendants expunge from plaintiff's personnel record any reference to her EEO activity within 15 days from the date of this order;

5. Defendants prepare annual performance appraisals and officer corps ratings reflecting a minimum "fully successful" level of performance for the period of May 26, 1985, until the date of plaintiff's reinstatement, and place such documents in plaintiff's personnel file within 15 days from the date of this order;

6. Defendants will credit plaintiff with the annual leave and sick leave she would have accumulated since December 13, 1991;

7a. Defendants establish a FERS basic annuity account for plaintiff and deposit into that account the amount of plaintiff's contribution and the amount of the employer's contribution as set forth above, by August 1, 1996;

7b. The amount of plaintiff's contribution to the FERS account which is made by defendants will be set off against the amount awarded to plaintiff thereby reducing the amount of payment to plaintiff required to satisfy the judgment;

8a. Defendants establish a TSP account for plaintiff and deposit in that account one percent (1%) of plaintiff's basic pay as set forth above, by August 1, 1996;

8b. Plaintiff notify defendants by certified mail if she elects to contribute an additional percentage of her basic pay to the TSP, and if so the amount of such percentage, within 10 days of the date of this order;

8c. If plaintiff elects to contribute to the TSP, defendants will calculate, as set forth above, the amount of plaintiff's elective contribution and defendants' matching contribution and notify plaintiff of same within 10 days after receipt of plaintiff's election;

8d. Plaintiff will forward to defendants for deposit in her TSP account the amount of her elective contribution, if any, within 60 days from the date of this order;

8e. Defendants will deposit plaintiff's elected contribution and the INS matching contribution in plaintiff's TSP account within five days of receipt;

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

Dated: May 31, 1996, Utica, New York.